Arturo E. Matthews, Jr., Esq. (SBN 145232)
MATTHEWS LAW FIRM, INC.
2522 Chambers Road, Suite 100
Tustin, California 92780
Telephone: (714) 647-7110
Telecopier: (714) 647-5558
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

RLI INSURANCE COMPANY a/s/o Seafood Doctor, Inc., and SEAFOOD DOCTOR, INC.,

Plaintiffs,

- v. -

HARVEST KING TRADING USA, LIMITED, COASTAL CORPORATION, LTD., and ORIENT OVERSEAS CONTAINER LINE LIMITED,

Defendants.

Case No.: 22 Civ. (     )

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, RLI Insurance Company, Inc. ("RLI"), and Seafood Doctor, Inc. ("Seafood"), by and through their attorneys, Matthews Law Firm, Inc. and Kennedy Lillis Schmidt & English, allege upon information and belief as follows:

**INTRODUCTION**

1. This action arises from the non-delivery and theft of a shipment of thirty-five thousand (35,000) pounds of frozen shrimp ("Cargo"), owned by Seafood and insured by RLI, sold to Seafood by Coastal Corporation, Ltd. ("Coastal"), tendered for shipment to Orient Overseas Container Line Limited ("OOCL"), and stolen by Harvest King Trading USA, Limited ("Harvest King").

1

## PARTIES

2. Seafood was and is an Oregon corporation with an office for the transaction of business at 4848 Airway Drive, Central Point, Oregon 97502.

3. Seafood is an importer and wholesaler of frozen seafood products.

4. Seafood owned the Cargo.

5. RLI was and is an Illinois corporation with an office for the transaction of business at 9025 North Lindbergh Drive, Peoria, Illinois 61615.

6. RLI insured the Cargo, paid Seafood's losses resulting from the incident detailed herein, and is thereby subrogated to Seafood's rights to the extent of that payment.

7. Seafood and RLI bring this action on their own behalves and as agents or trustees on behalf of all having an interest in the subject shipment.

8. Coastal was and is an India corporation with an office for the transaction of business at 15-1-37/3, Jayaprada Apartments, Nowroji Road, Maharanipeta, Visakhapatnam-530 002, Andhra Pradesh, India.

9. Coastal is an India-based producer, distributor, and exporter of frozen seafood products.

10. Coastal sold the Cargo to Seafood and arranged for its transport from India to the Port of Los Angeles.

11. Harvest King was an is a California corporation with an office for the transaction of business at 725 West Duarte Road, #1581, Arcadia, California 91077.

12. Harvest King is a foodstuffs importer and distributer who absconded with the Cargo upon its arrival at the Port of Los Angeles.

13. OOCL was and is a Hong Kong corporation with an office for the transaction of business at 31/F, Harbour Centre, 25 Harbour Road, Wanchai, Hong Kong, China.

14. OOCL is the ocean carrier that transported the Cargo under Bill of Lading No. OOLU2674887940, dated 27 July 2021 ("Bill of Lading").

## JURISDICTION & VENUE

15. Plaintiffs' claims arising under the Carriage of Goods by Sea Act, 46 U.S.C. App. § 1303 ("COGSA"), constitute admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and fall within the admiralty and maritime jurisdiction of the United States and of this Honorable Court pursuant to 28 U.S.C. § 1333(1).

16. This Honorable Court has subject matter jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1332 because this is an action between parties of diverse citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. This Honorable Court has personal jurisdiction over Defendants, and venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because Defendants' acts or omissions giving rise to the claim occurred within this judicial district.

## BACKGROUND

18. On or about 28 April 2021, Harvest King agreed to purchase the Cargo from Coastal for $126,000.00 ($3.60/lb. x 35,000 lbs.) under CY/CY shipping terms, pursuant to which Coastal was responsible for arranging the Cargo's ocean carriage from its facility in Visakhapatnam, India to the Port of Los Angeles.

19. Under the terms of the agreement, once the shipment arrived at the Port of Los Angeles and was cleared by the U.S. Food and Drug Administration ("FDA"), Harvest King would wire the agreed purchase price to Coastal prior to Coastal releasing the Cargo to Harvest King.

20. Coastal hired ocean carrier OOCL to carry the Cargo from the Port of Visakhapatnam to the Port of Los Angeles.

21. Coastal issued to Harvest King all necessary documents associated with the Cargo's purchase and shipment, including a Purchase Order, Commercial Invoice, Packing List, Certificate of Origin, and U.S. Department of State Shrimp Exporter's/Importer's Declaration, each of which listed Harvest King as consignee of the Cargo.

22. On 27 July 2021, OOCL accepted the Cargo at the Port of Visakhapatnam, agreed to carry it to the Port of Los Angeles, and issued the Bill of Lading – which likewise listed Harvest King as consignee of the Cargo – to cover the subject shipment.

23. Both the Purchase Order and Commercial Invoice that Coastal issued to Harvest King memorialized the payment terms specified in Paragraph 18, *supra*, namely that Harvest King was obligated to pay Coastal in full after the FDA cleared the Cargo and prior to Coastal releasing the Cargo to Harvest King.

24. Specifically, the Purchase Order stated "PAYMENT AFTER FDA PASSAGE," and the Commercial Invoice stated "PAYMENT BY [HARVEST KING] UPON FDA RELEASE AND BEFORE DELIVERY OF THE GOODS."

25. However, while the Cargo was en route, Harvest King advised Coastal that it would not remit payment until Coastal released the Cargo, so that Harvest King could pick up the Cargo and bring it to Harvest King's facility in Arcadia for inspection prior to payment.

26. Coastal did not accept Harvest King's attempt to alter the agreed-upon payment terms and advised Harvest King that it was cancelling the sale.

27. Coastal then approached Seafood to purchase the Cargo, and Seafood agreed to do so for the same purchase price of $126,000.00 and under the same payment terms,

namely that Seafood shall remit payment upon clearance of the Cargo by the FDA as a precondition to Coastal releasing it to Seafood.

28. Coastal issued to Seafood a revised Commercial Invoice, Packing List, Certificate of Origin, and U.S. Department of State Shrimp Exporter's/Importer's Declaration, to reflect Seafood as the purchaser and consignee of the Cargo.

29. Coastal then advised OOCL that Seafood – and not Harvest King – was now the consignee of the Cargo.

30. OOCL, in turn, revised the Bill of Lading by removing Harvest King and adding Seafood as the consignee.

31. Accordingly, the prior versions of the Bill of Lading and documents referenced in paragraph 21 listing Harvest King as the consignee became null and void.

32. On 6 October 2021, the Cargo arrived at the Port of Los Angeles and was cleared by U.S. Customs and the FDA on or about 10 October 2021.

33. Thereafter, OOCL sent an Arrival Notice to Seafood indicating that the Cargo had cleared and was ready for pick up.

34. Accordingly, Seafood wired the $126,000.00 purchase price to Coastal.

35. However, on the morning of 11 October 2021, before Seafood was able to collect it, Harvest King picked up the Cargo at the Port of Los Angeles – by presenting the Bill of Lading and/or other shipping documents referenced in paragraph 21 listing Harvest King as the consignee, which Harvest King knew to be null and void – and absconded with it to Harvest King's facility in Arcadia.

36. On 11 October 2021, the wholesale market value of the Cargo was approximately $157,500.00 ($4.50/lb x 35,000 lbs).

37. Seafood demanded that Harvest King either return the Cargo or pay Seafood $136,500.00, a slight premium on the $126,000.00 purchase price intended to partially compensate Seafood for its loss of profits on the market value of the Cargo.

38. However, Harvest King refused to remit payment to Seafood or to return the Cargo.

39. Coastal likewise refused to refund Seafood the $126,000.00 purchase price despite non-delivery of the Cargo.

40. As a result, Seafood suffered losses totaling $157,500.00 in damages, as nearly as can now be determined.

41. Seafood submitted a claim to RLI for its losses, and RLI paid Seafood $137,600 to settle the claim.  RLI thereby became subrogated Seafood's rights to the extent of that payment.

42. Seafood retains uninsured losses totaling approximately $19,000.00, the difference between the market value of the Cargo and the insurance settlement received from RLI.

**FIRST CAUSE OF ACTION AGAINST HARVEST KING:
<u>CIVIL THEFT UNDER CALIFORNIA PENAL CODE § 496(c)</u>**

43. Paragraphs 1 through 42 are incorporated by reference as though fully set forth at length herein.

44. California Penal Code section 496(a) prohibits "buy[ing] or receiv[ing] any property that has been stolen or that has been obtained ***in any manner constituting theft*** or extortion, knowing the property to be so stolen or obtained . . . ." Cal. Penal Code § 496(a) (emphasis added).  Section 496(a) applies equally to any "principal in the actual theft of the property." *Id.*

6

COMPLAINT

45. Under Penal Code section 496(c), "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for ***three times the amount of actual damages***, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees." Cal. Penal Code § 496(c) (emphasis added).

46. "A criminal conviction is not a prerequisite to recovery of treble damages. All that is required is a 'violation' of subdivision (a) . . . ." *Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (Cal. Ct. App. 2019).

47. In Penal Code section 484(a), California "consolidate[d] the . . . crimes known as larceny, embezzlement and obtaining property under false pretenses, into one crime, designated as theft. The basis of all of these crimes . . . is the unlawful taking or converting to one's own use of the property of another." *People v. Vidana*, 1 Cal. 5th 632, 640–41 (Cal. 2016)

48. Specifically, section 484(a) provides that "[e]very person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, . . . ***or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . or personal property***, is guilty of theft." Cal. Penal Code § 484(a) (emphasis added). "In determining the value of the property obtained, for the purposes of this section, the reasonable and fair market value shall be the test[.]" *Id.*

49. Thus, in providing for treble damages under section 496(a), the California Legislature "understood that the phrase 'a violation of subdivision (a)' would include theft by false pretense." *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1048 (Cal. Ct. App. 2013).

50. Harvest King committed theft by false pretense in violation of section 484(a) by fraudulently presenting the Bill of Lading and/or other documents referenced in paragraph 21 inaccurately listing Harvest King as consignee of the Cargo – all of which Harvest King knew to be null and void after Coastal cancelled the sale – to agents at the Port of Los

Angeles with the intention of defrauding said agents to release the Cargo to Harvest King, and then absconding with the Cargo when said agents, in reliance on the false documents, released it to Harvest King.

51. As such, Harvest King obtained the Cargo in a "manner constituting theft" in violation of Penal Code section 496(a).

52. Seafood, having paid Coastal in full, was the rightful owner of the Cargo at the time of the theft and, therefore, suffered injury as a result of Harvest King's theft.

53. As a direct and proximate cause of Harvest King's theft of the Cargo, Plaintiffs sustained damages, as nearly as can be determined, no part of which has been paid although duly demanded, in the sum of $157,500.00.

54. Under Penal Code section 496(c), Plaintiffs are entitled to recover from Harvest King treble damages totaling $472,500.00.

**SECOND CAUSE OF ACTION AGAINST HARVEST KING:**
**CONVERSION**

55. Paragraphs 1 through 54 are incorporated by reference as though fully set forth at length herein.

56. Seafood was and is the rightful owner of the Cargo, having paid Coastal in full upon the Cargo's arrival and clearance at the Port of Los Angeles.

57. Harvest King intentionally and substantially interfered with Seafood's rights to the Cargo by absconding with it at the Port of Los Angeles, carrying it to Harvest King's facility in Arcadia, and refusing to return it to Seafood.

58. Seafood did not consent in any manner to Harvest King's taking of the Cargo.

59. As a direct and proximate cause of Harvest King's conversion of the Cargo, Plaintiffs sustained damages, as nearly can now be determined, no part of which has been paid although duly demanded, in the sum of $157,500.00.

**FIRST CAUSE OF ACTION AGAINST COASTAL:
BREACH OF CONTRACT**

60. Paragraphs 1 through 59 are incorporated by reference as though fully set forth at length herein.

61. Seafood entered into a valid and enforceable contract with Coastal to purchase the Cargo.

62. Under that contract, Coastal was obligated to release and deliver the Cargo to Seafood upon Seafood's payment of the agreed $126,000.00 purchase price after the Cargo arrived at the Port of Los Angeles and was cleared by the FDA.

63. Seafood performed all its obligations under the contract by, *inter alia*, paying Coastal the agreed purchase price of $126,000.00 when the Cargo arrived at the Port of Angeles and was cleared by the FDA.

64. Coastal breached the contract by failing to deliver the Cargo to Seafood.

65. As a direct and proximate cause of Coastal's breach of its contract with Seafood, Plaintiffs sustained damages, as nearly as can now be determined, no part of which has been paid although duly demanded, in the sum of $157,500.00.

**FIRST CAUSE OF ACTION AGAINST OOCL:
BREACH OF CONTRACT OF OCEAN CARRIAGE**

66. Paragraphs 1 through 65 are incorporated by reference as though fully set forth at length herein.

67. As ocean carrier of goods for hire, OOCL was obligated by COGSA and the terms of the Bill of Lading to properly and safely transport, handle, carry, keep, care for, discharge, and deliver the Cargo in the same good order and condition as when received by it.

68. OOCL breached those duties by failing to deliver the Cargo in the same good order and condition as when received by it, and instead allowing Harvest King to abscond with it.

69. As a direct and proximate cause of OOCL's breach of its duties under COGSA and the terms of the Bill of Lading, Plaintiffs sustained damages, as nearly can now be determined, no part of which has been paid although duly demanded, in the sum of $157,500.00.

WHEREFORE, Plaintiffs demand judgment in their favor as follows:

1. Against all Defendants in a principal amount of $157,500.00, plus interest, costs, and disbursements;

2. Against Harvest King in the treble amount of $472,500.00, plus interest, costs, disbursements, and reasonable attorney's fees; and

3. For such other and further relief as this Court may deem just and proper.

Dated: May 10, 2022          MATTHEWS LAW FIRM, INC.

                             By: _s/ Arturo E. Matthews, Jr.___
                                  Arturo E. Matthews, Jr.,
                                  Attorney for Plaintiffs

COMPLAINT